# EXHIBIT A

1    J. Toji Calabro (SBN 239950)
     CALABRO | LAW OFFICE
2    Two Pershing Square
     2300 Main Street, 9th Floor
3    Kansas City, Missouri 64108
     Tel: (888) 585-1247
4    Email:  tojicalabro@calabro-law.com

5    Attorney for Plaintiff

6

7

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/29/2020 8:05 AM
By: Elizabeth Spann, Deputy

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                   **COUNTY OF SANTA BARBARA**

10              **SANTA BARBARA-ANACAPA DIVISION**

11

12                                              Case No.    20CV02153

13   PATH 42 PTY LTD, d/b/a DAIVID,            **COMPLAINT FOR DAMAGES AND**
                                               **RECOVERY OF PROPERTY**
14                  Plaintiff,

15                                                1.  Breach of Contract
                                                  2.  Breach of the Covenant of Good
16          v.                                        Faith and Fair Dealing
                                                  3.  Promissory Estoppel
17                                                4.  Misrepresentation
                                                  5.  Conversion
18   DEEP AI, INC.,                               6.  Trespass to Chattels

19                  Defendant                   **JURY TRIAL DEMANDED**

20

21

22          Plaintiff Path 42 PTY LTD d/b/a DAIVID, through undersigned counsel, complains and

23   alleges against Defendant Deep AI, Inc. as follows.

24                                   **INTRODUCTION**

25          1.      This case arises out of Defendant Deep AI's failure to honor its agreement with

26   Plaintiff Path 42, and its willful refusal to turn over Path 42's property. Deep AI holds itself out as

27   an expert in the burgeoning field of artificial intelligence, and contracted to use its purported

28   expertise to build an artificial intelligence product for Path 42. Despite Deep AI "guarantee[ing]"

                                              - 1 -
                                           COMPLAINT

to deploy the product by March 15, 2019, and despite Path 42 paying in full and in advance, Deep AI failed to meet the March 2019 deadline it set for itself, and it has *still* not delivered more than a year later.

2.      Throughout 2019 Path 42 continually pressed Deep AI to explain the delay and deliver what it had promised. But Deep AI grew evasive. There were long delays between communications and vague promises for updates that were slow to or never did materialize.

3.      Deep AI eventually admitted that it was in over its head. As Deep AI's founder, Peter Grigg, explained in his own words: Deep AI was "drinking out of a fire hose" and the analysis Deep AI promised to do was "more difficult than expected."

4.      Deep AI's incompetence and failure to deliver has cost Path 42 significant damages. As Deep AI knew from the beginning of the engagement, Path 42 engaged Deep AI to develop this project specifically because Path 42 had clients lined up. Deep AI's failure to deliver not only damaged Path 42's reputation (Path 42 could not deliver to its own clients without the work Deep AI promised to do), but also caused Path 42 to lose over $100,000 (United States Dollars) in profit per month.

5.      As Deep AI's delays continued, Path 42's losses continued to mount and, without the product Deep AI agreed to develop, Path 42 had no revenues. Increasingly desperate to salvage the product, their client relationships, and their business, Path 42 pressed its contractual rights and demanded that Deep AI turn over the work it had performed. But Deep AI refused to do even that. After Path 42 threatened legal action, Deep AI finally coughed up what it claimed was all the code it had written for the project. But what was there was anemic: a few lines of code that failed to meet the most basic standards of what Path 42 paid Deep AI to do. Path 42 estimates that the code took at most three (3) days to write—a far cry from the amount of time Deep AI claims it spent on the project. The code confirmed that Deep AI failed to perform the analysis it agreed to perform, or was improperly withholding work that it had done, or both.

6.      Deep AI's work was a complete loss to Path 42, and caused Path 42 substantial damages. Path 42 asked Deep AI to make up for the deficient work, but Deep AI refused. Path 42 had no other recourse than to file this action.

**PARTIES**

7.     Plaintiff Path 42 PTY LTD ("P42") is an Australian Proprietary company that currently does business as "DAIVID." It previously went by the name "Creature."

8.     Defendant Deep AI, Inc. ("DeepAI") is, on information and belief, a Delaware entity with its principal place of business in Santa Barbara, California.

**VENUE**

9.     Venue is proper in this Court because Defendant's principal place of business is in this county.

**FACTUAL ALLEGATIONS**

***Forrester and Traore Form P42 to Launch a New Business to Serve Their Existing Clients in the Advertising Industry***

1.     Ian Forrester and Lance Traore are the founders and owners of the company that became Plaintiff P42.

2.     Forrester and Traore met while working for a video advertising technology company. Traore was Managing Director of that company's Nordic operations before moving to Australia and becoming Managing Director of Australia and New Zealand. He has deep and significant relationships with media agencies and brands around the world. Similarly, Forrester headed up that company's global "insight" team and created its suite of advertising effectiveness products. He is a world-renowned expert in the field of digital media and its effectiveness; regularly writing articles in industry publications, speaking at conferences, and judging awards.

3.     On the forefront in the field of advertising technology, Forrester and Traore became deeper involved in the burgeoning filed of "computer vision," a discipline in which a computer is "taught" to "see" what is happening on the screen. The idea is that the computer will be able to recognize, on a second by second basis, what objects (such as "Labrador retriever") are on the screen, and what is happening in the scene (such as "is running across the field").

4.     Forrester and Traore realized that computer vision had enormous potential to revolutionize the advertising industry, and they conceived of a new business: to develop a system

that would harness computer vision and artificial intelligence to analyze video advertisements to predict how effective the advertisements are and/or would be.

5.     This promised to be an extremely valuable asset to their advertising clients: it would identify for advertisers the attributes of video advertisements that were most effective at engaging potential customers (to help in the crafting of ads); and it could predict whether particular video advertisements would be effective before they launch.

6.     To explore the viability of their idea, Forrester and Traore reached out to their contacts in the advertising industry, which included Publicis and MediaCom, two of the largest media agencies in the world. These clients were excited about P42's business plan, and so committed to helping the business get off the ground that they agreed to provide to P42 thousands of video advertisements that they had already produced, plus their proprietary performance data that measured how effective the advertisements were. The agencies' performance data showed, for example, how many people watched the ad all the way through, how many people "liked" it on Facebook, or shared it with their friends. P42 had also commissioned studies that recorded participants watching videos advertisements and captured how they responded to the ads by asking them a number of questions.

7.     The plan was to take all these data points, and use artificial intelligence to create a model that "learned" what parts of the advertisements drove consumer engagement.

8.     Building this system required great skill and hard work. Grossly simplified, however, the key conceptual steps were essentially two-fold: (1) use computer vision to "teach" the computer what was happening second by second in the videos the advertising clients had provided; and (2) employ data science techniques to correlate this second-by-second computer vision data with the performance data provided by the advertising clients to create a model that learns what drives consumer engagement across various demographics and other variables.

9.     To build this system—the foundation on which P42's entire business was based—P42 turned to Defendant DeepAI.

- 4 -
COMPLAINT

*DeepAI Represents It Can Do What P42 Needs*

10.     Defendant DeepAI is a company that purports to develop artificial intelligence technologies to support other businesses.

11.     Peter Griggs founded DeepAI with his partner, Kevin Baragona. On information and belief, they are the sole owners of the company.

12.     Forrester and Traore began speaking with Griggs about this project in late 2017.

13.     From the beginning, Griggs was enthusiastic and assured Forrester and Traore that DeepAI could handle the work. As Griggs wrote to Forrester in November 2017: "I've talked it over with our team, and it's something that is totally doable for us from standpoints of both skill and engineering bandwidth."

14.     On November 7, 2017, Griggs sent to Forrester and Traore a document describing DeepAI's understanding of the "MVP"—or "minimum viable product"—that Forrester and Traore needed.

15.     An MVP is exactly what it sounds like: it is a version of a product with just enough core features to effectively deploy the product. It is, in effect, "version 1.0."

16.     The MVP document DeepAI developed and shared with Forrester and Traore confirmed that Griggs understood the minimum requirements of the system from the very beginning of the negotiations, and that DeepAI could build it. As the document provided, the system, among other things, would "aggregate the specified video engagement data," and "be backed by the data science used to draw meaningful correlations between the aforementioned data for a given video."

17.     One of the "Key Features" described in the MVP was a "Dashboard" that, among other things, would provide:

        a.     "Interactive data visualizations for correlations & underlying stats

        b.     "Ability [to] filter/search data by underlying stats and correlations

        c.     "Single & bulk video upload from local or remote storage

        d.     "White-labeled dashboard – use [P42]'s branding"

18.     The MVP further provided for a "4 months to deployment" timeline with "bi-monthly stand-up meetings between DeepAI – [P42] for progress checks."

19.     And the "Intellectual Property Structure" was also clear: "DeepAI will provide full rights and ownership of source code for the dashboard and all backend code to handle social media ingestion, media files, and to draw insights."

20.     Negotiations between DeepAI and P42 continued through March 2018.

21.     While the details and full scope of the project were refined during the negotiations, there was never any doubt about the minimum requirements needed to create a viable product for P42's business.

22.     To underscore this point, P42 wrote to DeepAI on December 26, 2017, noting: "one thing we would like to bottom out is how developed your system currently is, and how developed it needs to be for our project to be a success. A couple of the other companies we've spoken to seem to have more advanced systems that are quite extensively trained. Looking at classifications/concepts, some of the systems can identify between 5k and 30k objects/concepts. . . . It would be good to get your thoughts on where you guys see yourselves in comparison, when/how you'll be at that level, and potentially how we could get there using 3rd party API solutions (if possible)."

23.     In the same communication, Traore underscored other critical system requirements: "In addition to these capabilities, as we have discussed a number of times, we need our system to include semantic assessments, something which is far beyond the capability of any system currently in existence. We would like to flesh this requirement out some more because, while we have discussed this with you, we feel we need to flesh out requirements so we're both fully cognisant of output requirements before committing to the work."

24.     Griggs responded two days later, on December 28, assuring P42 again that DeepAI could handle the work: "As for our system, the semantic labelling of scenes will be production ready after another 4 weeks. That will make our computer vision system as a whole able to recognize 25k+ concepts."

***The DeepAI – P42 Consulting Agreement***

25.     Negotiations continued between the parties and, in February 2018, P42 provided DeepAI with a draft contract P42's lawyers had drawn up. DeepAI, however, rejected it.

26.     In its place Griggs sent P42 an email on February 28, 2018, noting "[a]ttached is a b2b contractor agreement template from our law firm. We've been using this contract in similar b2b engagements, and it's working well for everyone."

27.     The parties used the template DeepAI's law firm prepared and, with minimal substantive modifications, executed it with an effective date of March 15, 2018. A true and correct copy of the contract (the "Consulting Agreement") is attached hereto as **Exhibit 1**.

28.     The Consulting Agreement identifies DeepAI as the "Consultant," P42 as the "Company," and provides that DeepAI "will provide consulting 'services to [P42] as described on Exhibit A hereto (the "Services")."

29.     Exhibit A to the Consulting Agreement outlines the Services, including that DeepAI was required to, among other things:

    a.     Provide "[s]econd by second computer vision assessment of what's happening on screen in test videos," "NLP [Natural Language Process] / sentiment analysis," "Send FB text to Watson[1] for personality profiling and store for later aggregation," and other data assessing concerning the videos;

    b.     "Build algorithmic models to determine key correlations among test batch data;"

    c.     "Build algorithmic models to determine correlations between video attributes and video outcomes, split by respondent information" over a series of attributes and metrics; and

    d.     "Create dashboards for the visualization of correlations to power 3 core Path 42 products: Ideate, Evaluate, Execute."

[1] Watson is an IBM artificial intelligence product: https://www.ibm.com/watson/about

30.     In Paragraph 1 to the Consulting Agreement, DeepAI represented to Path 42 that it was capable of performing the Services, and pledged to use its "best efforts" to produce "results that are satisfactory to [P42]":

> [DeepAI] represents that [it] . . . has the qualifications, the experience and the ability to properly perform the Services. [DeepAI] shall use [it]'s best efforts to perform the Services such that the results are satisfactory to the Company."

31.     Paragraph 5 to the Consulting Agreement gave P42 the immediate ownership rights to the work DeepAI created for P42:

> (c) **Inventions**. . . .Consultant understands that "<u>Company Inventions</u>" means any and all Inventions that Consultant or Consultant's personnel may solely or jointly author, discover, develop, conceive, or reduce to practice in connection with, or as a result of, the Services performed for the Company or otherwise in connection with the Relationship, except as otherwise provided in Section 5(g) below.

> (d) **Assignment of Company Inventions**. Consultant will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and ***hereby assigns to the Company, or its designee, all of Consultant's right, title and interest throughout the world in and to any and all Company Inventions*** and all patent, copyright, trademark, trade secret and other intellectual property rights and other proprietary rights therein.

> (h) **<u>All Company inventions created by the Consultant for or on behalf of the Company</u>** that are used in, related to or necessary for the subject matter of this agreement including any associated trademarks, trade names, algorithms, systems, methodologies, data, goodwill, visualizations and any other intellectual property rights and arrangements ***vest in the Company immediately upon creation.*** Excluded from this statement are any of DeepAI's underlying technology, AI, computer vision algorithms, machine learning algorithms, systems, or models enhanced or developed on behalf of Company or Version 1. The aforementioned assets shall remain the property and inventions of Consultant in perpetuity.

> (bold italics emphasis added)

32.     Paragraph 6 to the Consulting Agreement imposed on DeepAI an affirmative obligation to deliver all of P42's property to P42:

> 6. **<u>Company Property: Returning Company Documents</u>**. . . . At the time of termination of the Relationship, Consultant ***will deliver to the Company (and will not keep in Consultant's possession, recreate or deliver to anyone else) any and all*** devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or

- 8 -

reproductions of any of the aforementioned items developed by Consultant or Consultant's personnel pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

(bold italics emphasis added)

33.     In Paragraph 9 to the Consulting Agreement, DeepAI agreed to indemnify and hold P42 harmless from, among other things, all "losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly" out of DeepAI's negligence and/or breach of the Consulting Agreement:

> 9. **Indemnification**. Consultant **shall indemnify and hold harmless** the Company and its affiliates and their directors, officers and employees **from and against all** taxes, **losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with** (i) **any negligent, reckless or intentionally wrongful act** of Consultant or Consultant's Assistants (as defined below), employees, contractors or agents, (ii) **any breach by** the Consultant or Consultant's Assistants, employees, contractors or agents of any of the covenants contained in this Agreement, (iii) **any failure of Consultant to perform the Services** in accordance with all applicable laws, rules and regulations, or (iv) any violation or claimed violation of a third party's rights resulting in whole or in part from the Company's use of the Inventions or other deliverables of Consultant under this Agreement.

(bold italics emphasis added)

34.     Paragraph 13 to the Consulting Agreement required DeepAI to report to P42 at P42's discretion:

> 13. **Supervision of Consultant's Services**. . . . "[DeepAI] will be required to report to [P42] concerning the Services performed under this Agreement.  The nature and frequency of these reports will be left to the discretion of [P42].

35.     Exhibit B to the Consulting Agreement provided the payment and development schedule for the project. It provided for a four-month development schedule to begin in March 2018, and be completed by July 2018. It also provided for P42 to make four monthly payment installments of $17,500 over the same time period, for a total of $70,000.

36.     P42 timely paid the full contract price of $70,000.

- 9 -
COMPLAINT

*DeepAI "Guarantees" to Deploy by March 2019*

37.    The collection of videos from P42's clients to be used in developing the product was not available at the commencement of the planned development schedule. P42 kept DeepAI informed of the progress, and DeepAI was not ready to begin work then anyway. DeepAI was still working on developing its own systems (which were not ready in March 2018) to do the work DeepAI agreed to perform for P42.

38.    For example, in an April 17, 2018 email exchange—more than a month after development was scheduled to begin—Griggs informed P42 that DeepAI was still "working on building out more robust computer vision infrastructure to analyze your videos." He detailed a number of models that DeepAI was still "training," including that DeepAI was "about to start training production versions of the semantic action recognition model, celebrity recognition model, and logo recognition model with additional data coming in from our data crew." This, even though Griggs represented in December that the semantic model would be ready in January. Griggs further noted that DeepAI still has "a lot of models that will finish training runs in the next week. So lots of fun stuff happening that will be huge for getting deep analysis of your videos."

39.    On April 26, 2018, P42 sent the first group of videos and data to DeepAI. Though this was not all of the videos to be included in the work, DeepAI was still not ready to process any of the videos. As the parties discussed during a May 9, 2018 call, DeepAI was still developing its image recognition system, and still had seven employees tagging images for the semantic model.

40.    By May 16, 2018, DeepAI had reviewed the data that P42 had sent over, and Griggs told P42: "awesome job selecting this data, btw. These videos and the associated data are going to be great to juxtapose and analyze en masse."

41.    The next day, on May 17, 2018, Forrester asked Griggs whether DeepAI had "written that script to extract videos from the [YouTube] links [P42] sen[t] you and from the [Google] drive? If not could you please, and save the videos in a central folder we can all access? . . . It would be good to see how many videos have been uploaded. . ."

42.    Griggs agreed to do so the same day, confirming that P42 wanted "all of the YouTube videos from the list of 100 put into a google drive folder," and "all of the vides from the

other dataset that are in google drive already also moved into that same folder," and "you want any new videos that are added to the existing google drive dataset to be added to that same new central folder."

43.     On June 13, 2018, Griggs sent this mockup of what the dashboard would look like:



44.     Forrester responded that this was "definitely on the right lines."

45.     On August 1, 2018, P42 forwarded a link to IBM's "The Dataset." Forrester noted that IBM is "focusing very much on the understanding of semantic meaning of collections of objects. While their approach is still very basic and no where near where we need [it to] be, ingesting their data could give us an advantage."

46.     Griggs responded the next day: "This is awesome – thanks for sharing. We haven't used this dataset, but after talking with the guys It sounds like we will start incorporating. Good find." He further noted that "it's actually better [than DeepAI's approach] for a number of reasons." But DeepAI never did incorporate this information.

47.     On September 9, 2018, Forrester asked Griggs for DeepAI's plan to build P42's product. The next day, Griggs provided the following timeline, noting: "I've attached the timeline

with deliverables and review meetings included. After talking with the guys, we're confident we can speed things up for you from our initial timeline and get it done with two months of work. With our current dev pipeline and bandwidth, we can start working on this on January 15th and deploy your v1.0 dashboard with insights and data visualizations by March 15th."



48.     A four-month delay from September 2018 (already months later than originally planned) for even *commencing* work was not acceptable to P42 and far from what the parties agreed. The delay placed P42 in dire financial straits. P42 had already paid the entire contract price by June 2018. Their business was earning no revenue because they could not launch their product before DeepAI completed its work, and P42's clients were anxious for results. As P42 explained to Griggs on September 10:

> Unfortunately, this is very far away from our expected timeline. We were prepared for a minor delay in the project based on our data delivery being delayed but to wait until January to start the project with delivery in March is really far too late. We have selected the most engaging videos in Australia during the latest 52 weeks as those to analyse for the build. With each passing day the data set becomes more and more out of date, so we need to start on the build as soon as we can. We have also received free data from clients on the basis that we will produce an output analysis for them; they are expecting outputs by mid-January at the latest.

> During our last conversation you said you could start at the end of October. While this was disappointing, this would be a reasonable amount of time to wait to start the project. What can we do here to move the project forward with a delivery date of mid-January?

49.     Griggs knew of P42's financial bind, and he knew that P42 had already paid DeepAI in full. Thus, he pressed his position—acknowledging that he had agreed to an earlier date before, but he refused to honor it. Instead, he presented P42 with two bad options: (1) having DeepAI start January 15th and deploying by March 15th; or (2) paying DeepAI an extra $17,500 per month, for the next three months, to have it finished by December 1.

50.     Forrester tried to reason with Griggs. On September 12, 2018 he wrote: "I'm sorry, but I'm afraid [Traore] and I don't agree that we should pay more to have the project delivered before March. We have paid for the project in full but have had no data science resource allocated to us as yet. This means we have funded your data scientists to work on other projects. We now feel that you should allocate some of your data science resource to work on our project." He proposed alternatives, including delaying delivery until January 31, 2019, noting that he "think[s] the above represents a fair compromise, taking into account the needs of your other projects while still delivering for DAIVID in a timely manner," but Griggs rejected the alternatives the same day. Griggs reiterated, however, that "January 15th is the soonest we can start. And we will deploy by march 15th."

51.     Given the difficult spot in which DeepAI had placed P42, P42 kept trying to find a creative solution. Though Griggs wrote that he "underst[oo]d the urgency of getting [P42's] product to market," he was unwilling to do it sooner without substantial additional costs that he knew P42 could not afford.

52.     On September 17, 2018, after DeepAI rejected further requests by P42, Griggs reiterated that P42 would have to pay substantial amounts to have the product delivered earlier, "Otherwise, I'm happy to guarantee starting on January 15th and deploying by March 15th."

53.     P42 was forced to concede. As Forrester wrote to Griggs on September 17, "We can't pay another $13K, so we will wait until January."

54.     As noted before (*see supra* ¶ 34), DeepAI had a contractual obligation to report to P42 regarding the performance of the work at P42's discretion. And P42 kept asking Griggs for a detailed project plan, including timelines and detailed milestones for deliverables. For example, on October 21, Forrester provided examples of the information they were looking for:

- • "Timing for me [Forrester] to take your team through the various data sets, and our core products. This will allow them to understand our required outputs much more clearly,"

- • "Plan to use NLP to tag the dialogue contained in videos,"

- • "Plan to add semantic tags to add the human layer of tagging we require (having a 'human in the loop'),"

- • "Plan to fuse emotional, campaign and YT/FB data sets and/or visualise them differently,"

- • "Plan to produce iterations of the dashboard with feedback loops."

Forrester also requested in this email that the parties take stock on December 14, 2018, of the videos they had to ensure that the project was on target. Forrester informed DeepAI in a separate email the same day that beginning December 14, he would have no other obligations, and could dedicate himself full time to this project.

55.     But despite DeepAI's contractual obligations to report to P42 at P42's discretion, Griggs did not respond until November 2—nearly two weeks later—and after several chaser emails from Forrester. When Griggs did respond, he simply provided the same basic timeline he provided in September (*see supra*, ¶ 47), noting that the "analytics and data from the bullets in your previous email will all be included in the "week 3: review initial analytics outputs" meeting. Griggs also rejected P42's request to discuss the state of the videos on December 14, and instead  proposed that the parties talk on January 9 or 10 to go through the videos and datasets P42 provided, and he forwarded again the mock-up of what he understood the dashboard should look like (*see supra* ¶ 43).

56.     In response, Forrester asked for an earlier date to discuss the videos and data, and for a more detailed timeline, but Griggs did not provide any substantive response for weeks.

57.     On December 31, 2018, P42 provided to DeepAI the videos and data required for DeepAI to perform its analysis. Griggs responded: "Awesome! This is great. Nice work on pulling all of this together."

58.     Additional videos were provided by P42's advertising clients after this date but DeepAI had all of them by January 14, 2019. On January 15, 2019—the day DeepAI promised to begin work on P42's project—Griggs acknowledged receipt: "This is all great stuff.  Thanks for fulling this list together!" He further committed to "pulling these videos today." DeepAI agreed to include them in the project, and never mentioned that they would delay the guaranteed deployment date of March 15, 2019.

***DeepAI Fails to Deliver by March 15, 2019***

59.     As the March 15, 2019 deadline approached, Griggs was growing less and less responsive. P42 was constantly checking in on progress, only to be met with days and sometimes weeks of silence. Griggs acknowledged this in a February 19 email, writing: "Apologies for the inconsistent communication. We've been drinking out of a firehose over here."

60.     Despite P42's best efforts to ensure that DeepAI was on track, DeepAI failed to meet the March 15, 2019, deadline it set for itself for deploying P42's product.

61.     Throughout 2019 P42 continued to follow up, imploring DeepAI for updates and asking when the work would be done. DeepAI knew that P42 had no money, and that P42 could not earn any revenue until the product was deployed in the marketplace, but there appeared to be no real sense of urgency on DeepAI's part. Griggs continued to be slow to respond to P42's inquiries, and DeepAI's completion of the product appeared to be nowhere in sight.

62.     By May 2019, P42 was desperate. It had been nearly a year since P42 had paid the entire $70,000 contract price to DeepAI, but DeepAI had not provided the product—or any of the underlying work—that it had promised to provide to P42, and there was no reasonably reliable completion date in sight. And because P42 had no product, it had no revenue. What's more, DeepAI's continuing failure to complete the product was ruining P42's reputation with its clients, and causing P42 to miss out on substantial revenues.

63.     P42 continued to follow up with DeepAI but got no serious engagement for months.

64.     On July 26, 2019—more than 4 months after the deadline by which DeepAI had "guaranteed" the product would be deployed—Grigg sent a spreadsheet of results from its work. In an email explaining the results, it became clear what had bogged down the analysis for so long:

DeepAI did not know what it was doing. As Griggs admitted: "The analysis ended up being a bit more difficult than expected." Griggs blamed DeepAI's failure on the data P42 provided, but that was a ruse: P42 subsequently hired other data scientists who were able to perform the analysis with the same data.

65. Moreover, when P42 dug into the output DeepAI had provided, P42 discovered that it was far below what the parties agreed to in the contract, and certainly not "satisfactory to P42." (*Supra*, ¶ 30.) Major deficiencies in DeepAI's work included, among other things, that: (1) fundamental computer vision work was not done; (2) DeepAI unilaterally disregarded critical performance data, using only 13 of the 27 emotions included, only a handful of the facial coding action units, and ignoring key brand metrics such as brand recall and purchase intent.; (3) DeepAI failed to use the Watson APIs; and (4) DeepAI failed to provide the very point of the work: the ability for P42 to manipulate the data by taking into account different variables so that it can discover the key correlations and advise their advertising clients appropriately. The model was nowhere near ready to show to a client—it was not a minimum viable product.

66. On August 5, Griggs promised to start pulling all the raw data and to "look into" using the Watson APIs, but did not provide any of this data until September 4, 2019. Again, his excuse was that his "entire team has been drinking out of a firehose," but DeepAI's poor business planning does not, of course, excuse DeepAI breaching its duties and obligations to P42.

67. Even the data DeepAI provided in September—nearly 6 months after the date by which DeepAI "guaranteed" the work would be done—was insufficient. Among other things, DeepAI had failed to perform basic computer vision tagging on hundreds of videos, and even those videos that DeepAI had purportedly "tagged" were not done competently.

68. On September 10, 2019, Forrester asked for Griggs to rectify these problems and offered to arrange a call to walk through the issues.

69. With no response from Griggs or anyone at DeepAI, Traore followed up on September 15 and reminded Griggs of what Griggs had known since 2017—that P42's entire business has been resting on DeepAI doing what it agreed to do, and DeepAI's failure to perform was causing P42 severe economic damage:

> Given that we cannot move forward with DAIVID in any capacity until we've solved this. Based on what Ian's email [says] below a lot of the work hasn't been done. Only 2/3 of the videos agreed on have been tagged and out of those there seems to be a fair few that haven't been tagged correctly. The 100 videos from our emotional test which are the most important seems to be missing. We never got to the point of building the dashboard etc. . . . so right now Im just interested in a solution so that we can get a product we can take to market . . . .I've already got all lot of keen clients knocking on the door so for us time is crucial. It's also a space that is rapidly gaining traction so we want to keep the opportunity to be ahead of the curve.

70.    Griggs responded the next day and ***admitted*** that DeepAI failed to tag and incorporate into the analysis hundreds of videos—20% of the dataset. This was an egregious failure. As is common knowledge in the industry—and even in the broader popular culture—machine learning gets better with more data. And because this project was *new*, all of the data that could be used in the analysis was important. DeepAI's decision to unilaterally ignore 20% of the data meant that what little analysis DeepAI did do was fundamentally flawed.

71.    In his September 16 email, Griggs claimed that Forrester had agreed with him to "hold off on using the publicis videos," because "the engagement metrics we're [sic] different than all of the other datasets." But this was false. The metrics were not different. There is no record of Forrester agreeing to ignore the Publicis videos and it would make no sense for him to have done so—Publicis was one of P42's major clients, and P42 had worked hard to procure those videos. P42 could not tell Publicis that P42 decided unilaterally to just throw the Publicis videos out.

72.    On September 22, P42 followed up, noting that "It was never agreed to tag less videos. In fact we were trying to get more videos tagged by you." He further noted that the "Publics videos contain the same metrics as the Mediacom videos and there's +500 of them as well. Anytime we had issues like with some of the Mediacom videos we backfilled with additional FB api videos to hit the 3k mark. Either way that's good news that you will tag the videos for us."

73.    Nevertheless, DeepAI never redid the analysis with all the videos. And it never completed a minimum viable product for P42.

***DeepAI's Failure to Deliver Caused P42 Substantial Damages***

74.    Because of DeepAI's utter failure to perform the work they agreed to perform, P42 has suffered substantial losses.

75.    As DeepAI knew from the commencement of the parties' working relationship, P42 was creating a business based on the work DeepAI had agreed to perform.

76.    DeepAI knew that P42 had clients lined up who were eager to use the product that P42 asked DeepAI to develop.

77.    DeepAI knew that P42 could earn no revenue until the product DeepAI had agreed to build for P42 was deployed.

78.    DeepAI knew that P42 would lose revenue for each month it delayed in providing P42 with the work DeepAI agreed to perform for P42.

79.    DeepAI's failure to perform has caused P42 reputational loss, and lost profits for the months they were unable to deploy the product. Indeed, just one of P42's clients, Publicis, has already explained that if P42 would have been able to deploy the product by the March 15, 2019, date DeepAI had "guarantee[d]," Publicis would have provided P42 with approximately $100,000 (United States Dollars) in business per month. This means that every month DeepAI delayed, DeepAI caused another $100,000 in lost business from just one of P42's clients.

80.    DeepAI's failure to perform has also caused P42 to hire others to perform the work that DeepAI agreed to perform, which caused additional out of pocket costs to P42 and the dilution of the equity in the company.

81.    DeepAI has also refused to turn over all of the property that belongs to P42 under Paragraph 5 of the Consulting Agreement. This has caused P42 losses because it has not been able to deploy its product for as long as DeepAI retained possession of this property, and it also made it more difficult, and more expensive, to create the product in house because P42 did not have the benefit of the work DeepAI had done.

82.    DeepAI has refused to return any of the $70,000 that P42 paid to DeepAI under the contract.

83.     After efforts to settle this dispute out of court failed, P42 filed this action.

**CAUSES OF ACTION**

**COUNT  I**
**BREACH OF CONTRACT**

84.     P42 repeats and realleges each of the allegations above as set forth here.

85.     P42 and DeepAI entered into the Consulting Agreement, which was and is a binding contract.

86.     Further, DeepAI was contractually bound to perform under the Consulting Agreement by March 15, 2019.

87.     P42 did all, or substantially all, of the significant things that the parties' agreements required P42 to do.

88.     DeepAI failed and refused to perform its obligations under the parties' agreements in various ways including, but not limited to:

      a.     Failure to develop and deploy the minimum viable product contemplated by the Consulting Agreement;

      b.     Failure to develop and deploy the minimum viable product contemplated by the Consulting Agreement by March 15, 2019;

      c.     Failure to perform its obligations under the Consulting Agreement such that the results were satisfactory to P42;

      d.     Failure to timely download and analyze 3,000 of the videos P42 provided to DeepAI for the project;

      e.     Failure to analyze 3,000 of the videos P42 provided for analysis as required by the Consulting Agreement;

      f.     Failure to conduct calls with and report to P42, as P42 had requested, concerning DeepAI's performance of the Services described in the Consulting Agreement;

COMPLAINT

g.   Failure to perform the data science work DeepAI agreed to perform in the Consulting Agreement, including but not limited to the failure to comply with generally accepted standards in the industry for completing such data science work;

h.   Failure to build the algorithmic models necessary to determine correlations between video attributes and video outcomes identified in the Consulting Agreement;

i.   Failure to create a dashboard that allowed P42 to manipulate the data by taking into account different variables so that it can discover the key correlations and advise their advertising clients appropriately; and

j.   Failure to turn over to P42 all of the work, inventions, and other property it owns under the Consulting Agreement.

89.   As a direct and proximate result of DeepAI's breach, P42 has been damaged in the amount of the $70,000 contract price, lost profits in excess of $2 million (United States Dollars) in an amount to be determined at trial, additional out of pocket costs and dilution of P42's equity to be valued at trial.

WHEREFORE, Plaintiff prays for judgment for damages in excess of $2 million (United States Dollars) in an amount to be determined at trial, an order directing DeepAI to turn over all work, inventions and other property to which P42 is entitled on the Consulting Agreement; attorneys fees and costs, costs of suit, prejudgment interest, and for such other and further relief as the Court may deem just and proper.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

90.   P42 repeats and realleges each of the allegations above as set forth here.

91.   P42 and DeepAI entered into the Consulting Agreement, which was and is a binding contract.

92.   P42 did all, or substantially all, of the significant things that the contract required P42 to do.

93.     DeepAI interfered with P42's right to receive the benefits of the contract in various ways including, but not limited to:

  a. Failure to develop and deploy the minimum viable product contemplated by the Consulting Agreement;

  b. Failure to develop and deploy the minimum viable product contemplated by the Consulting Agreement by March 15, 2019;

  c. Failure to perform its obligations under the Consulting Agreement such that the results were satisfactory to P42;

  d. Failure to timely download and analyze 3,000 of the videos P42 provided to DeepAI for the project;

  e. Failure to analyze 3,000 of the videos P42 provided for analysis;

  f. Failure to timely notify P42 if any of the videos P42 provided to DeepAI were no longer available or otherwise unusable;

  g. Failure to conduct calls with and report to P42, as P42 had requested, concerning DeepAI's performance of the Services described in the Consulting Agreement;

  h. Failure to perform the data science work DeepAI agreed to perform in the Consulting Agreement, including but not limited to the failure to comply with generally accepted standards in the industry for completing such data science work;

  i. Failure to build the algorithmic models necessary to determine correlations between video attributes and video outcomes identified in the Consulting Agreement;

  j. Failure to create a dashboard that allowed P42 to manipulate the data by taking into account different variables so that it can discover the key correlations and advise their advertising clients appropriately; and

  k. Failure to turn over to P42 all of the work, inventions, and other property it owns under the Consulting Agreement.

94.     As a direct and proximate result of DeepAI's breach of the implied covenant of good faith and fair dealing, P42 has been damaged in the amount of the $70,000 contract price, lost profits in excess of $2 million (United States Dollars) in an amount to be determined at trial, additional out of pocket costs and dilution of P42's equity to be valued at trial.

95.     WHEREFORE, Plaintiff prays for judgment for damages in excess of $2 million (United States Dollars) in an amount to be determined at trial, an order directing DeepAI to turn over all work, inventions and other property to which P42 is entitled on the Consulting Agreement; attorneys fees and costs, costs of suit, prejudgment interest, and for such other and further relief as the Court may deem just and proper.

**COUNT III**
**PROMISSORY ESTOPPEL**

96.     P42 repeats and realleges each of the allegations above as set forth here.

97.     DeepAI made a number of promises to P42, including:

    a.     Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI promised to develop and deploy the minimum viable product contemplated by the Consulting Agreement;

    b.     In September 2018, DeepAI guaranteed to P42 that it would deploy the minimum viable product contemplated by the Consulting Agreement by March 15, 2019;

    c.     Over the course of their negotiations and in the Consulting Agreement, DeepAI promised to perform its obligations under the Consulting Agreement such that the results were satisfactory to P42;

    d.     Over the course of their negotiations and in the Consulting Agreement, DeepAI promised to analyze 3,000 of the videos P42 provided for analysis;

    e.     Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI promised to conduct regular calls with P42 to discuss progress, and ensure that the project was on track;

f. Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI promised to perform data science work that could be used to "draw meaningful correlations" between videos and data P42 provided;

g. Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI promised to build the algorithmic models necessary to determine correlations between video attributes and video outcomes identified in the Consulting Agreement;

h. Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, Griggs' June 13, September 10, and November 2, 2018, emails, DeepAI promised to create a dashboard that allowed P42 to manipulate the data by taking into account different variables so that it can discover the key correlations and advise their advertising clients appropriately; and

i. Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI promised to deliver to P42 all of the work, inventions, and other property it owns under the Consulting Agreement.

98. It was foreseeable to DeepAI that P42 would rely on these promises in part because DeepAI intended P42 to rely on them to secure P42's business for DeepAI.

99. P42 actually relied on these promises.

100. P42 reasonably relied on these promises.

101. DeepAI failed to follow through on these promises.

102. As a direct and proximate result of DeepAI's failure to honor these promises, P42 has been damaged in the amount of the $70,000 contract price, lost profits in excess of $2 million (United States Dollars) in an amount to be determined at trial, additional out of pocket costs and dilution of P42's equity to be valued at trial.

103.    WHEREFORE, Plaintiff prays for judgment for damages in excess of $2 million (United States Dollars) in an amount to be determined at trial, an order directing DeepAI to turn over all work, inventions and other property to which P42 is entitled on the Consulting Agreement; attorneys fees and costs, costs of suit, prejudgment interest, and for such other and further relief as the Court may deem just and proper.

**COUNT  IV**
**MISREPRESENTATION**

104.    P42 repeats and realleges each of the allegations above as set forth here.

105.    DeepAI made a number of representations to P42, including:

    a.    In November 2017, DeepAI represented to P42 that developing and deploying the MVP for P42 was "something that is totally doable for [DeepAI] from standpoints of both skill and engineering bandwidth;"

    b.    Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI represented to P42 that it would and could develop and deploy the minimum viable product contemplated by the Consulting Agreement;

    c.    Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI represented to P42 that it could produce a system for P42 that would "aggregate the specified video engagement data," and "be backed by the data science used to draw meaningful correlations between the aforementioned data for a given video;"

    d.    Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI represented to P42 that it could create a "Dashboard" that, among other things, would provide: (1) "Interactive data visualizations for correlations & underlying stats;" (2) the "Ability [to] filter/search data by underlying stats and correlations;" (3)

"Single & bulk video upload from local or remote storage;" and (4) "White-labeled dashboard – used [P42]'s branding;"

    e.    Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI represented to P42 that it would take only "4 months to deployment;"

    f.    Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI represented to P42 that it would conduct "bi-monthly stand-up meetings between DeepAI – [P42] for progress checks;"

    g.    Over the course of their negotiations, including in the November 2017 proposals DeepAI prepared for P42, DeepAI represented to P42 that "DeepAI will provide full rights and ownership of source code for the dashboard and all backend code to handle social media ingestion, media files, and to draw insights;"

    h.    Over the course of their negotiations, including in a December 28, 2017 email, DeepAI represented that by the end of January 2018, DeepAI's system would be capable of semantic labelling of scenes and able to recognize 25k+ concepts;" and

    i.    In April 2018, DeepAI represented that its systems would be ready in May 2018.

106.    DeepAI made these representations with the intent that P42 rely on them and P42 did in fact reasonably rely on them.

107.    Each of these representations was false and/or misleading when stated, at the time P42 entered into the Consulting Agreement, and/or the time P42 paid DeepAI under the Consulting Agreement.

108.    DeepAI had a duty to correct these misrepresentations before P42 entered into the Consulting Agreement and/or paid DeepAI under the Consulting Agreement, even if some or all of these representations were true or believed to be true when said, because DeepAI knew that P42

was entering into a business transaction with DeepAI based on such representations and, among other things:

  a. DeepAI knew that the representations were at the very least only partially true or ambiguous and full disclosure of DeepAI's capabilities and intentions was necessary to prevent these representations from being misleading;

  b. DeepAI subsequently acquired information that it knew made the representations untrue or misleading; and/or

  c. These representations were basic aspects of the contemplated transaction between DeepAI and P42, DeepAI knew that P42 was mistaken about what DeepAI's true capabilities and intentions were at the time P42 was entering into the Consulting Agreement and/or making payments to DeepAI under the Consulting Agreement, and because of the relationship and circumstances between DeepAI and P42, P42 would reasonably expect a disclosure of those facts.

109. As a direct and proximate result of P42's reliance on DeepAI's misrepresentations P42 has been damaged in the amount of $ the $70,000 contract price, lost profits in excess of $2 million (United States Dollars) in an amount to be determined at trial, additional out of pocket costs and dilution of P42's equity to be valued at trial.

110. DeepAI acted with malice, oppression, or fraud.

111. DeepAI acted with intent to cause P42 injury. Its conduct was despicable and was done with a willful and knowing disregard of P42's rights, and fraudulent, based in part on the facts alleged above, including: DeepAI knew that P42 was deceived by DeepAI's prior representations but proceeded anyway for the pecuniary gain from the transaction.

112. DeepAI's conduct also subjected P42 to cruel and unjust hardship in knowing disregard of P42's rights based in part on the facts alleged above, including: DeepAI knew that P42's fledgling business was dependent on the product that DeepAI falsely represented that it would be able to produce, knew that P42 had limited financial means, knew that P42 could not

1  generate revenue without the product DeepAI falsely promised it could produce, and yet still

2  proceeded anyway for the pecuniary gain from the transaction.

3      WHEREFORE, Plaintiff prays for judgment for compensatory damages in excess of

4  $2 million (United States Dollars) in an amount to be determined at trial, punitive damages in an

5  amount to be determined at trial, an order directing DeepAI to turn over all work, inventions and

6  other property to which P42 is entitled on the Consulting Agreement; attorneys fees and costs,

7  costs of suit, prejudgment interest, and for such other and further relief as the Court may deem just

8  and proper.

9
10                          **COUNT  V**
                           **CONVERSION**

11     113.    P42 repeats and realleges each of the allegations above as set forth here.

12     114.    P42 owns all Company Inventions as that term is defined in the Consulting

13  Agreement.

14     115.    DeepAI has substantially interfered with P42's property by intentionally preventing

15  P42 from having access to it, in part by intentionally misrepresenting and/or concealing that it was

16  maintaining such property.

17     116.    P42 has not consented to DeepAI withholding P42's property and has affirmatively

18  requested that DeepAI deliver P42's property to P42.

19     117.    As a direct and proximate result of DeepAI converting P42's property, P42 has

20  been harmed.

21     118.    DeepAI acted with malice, oppression, or fraud.

22     119.    DeepAI acted with intent to cause P42 injury. Its conduct was despicable and was

23  done with a willful and knowing disregard of P42's rights, and fraudulent, based in part on the

24  facts alleged above, including: DeepAI knew that P42's fledgling business was dependent on the

25  product that DeepAI falsely represented that it would be able to produce, knew that P42 had limited

26  financial means, knew that P42 could not generate revenue without the product DeepAI falsely

27  promised it could produce, knew that returning the property to P42 would help P42 develop the

28

product that DeepAI failed to develop, yet DeepAI still refused to provide the property to P42 and instead represented that it had turned over all property.

120.    DeepAI's conduct also subjected P42 to cruel and unjust hardship in knowing disregard of P42's rights based in part on the facts alleged above, including: DeepAI knew that P42's fledgling business was dependent on the product that DeepAI falsely represented that it would be able to produce, knew that P42 had limited financial means, knew that P42 could not generate revenue without the product DeepAI falsely promised it could produce, knew that returning the property to P42 would help P42 develop the product that DeepAI failed to develop, yet DeepAI still refused to provide the property to P42 and instead represented that it had turned over all property.

WHEREFORE, Plaintiff prays for judgment for compensatory damages in excess of $2 million (United States Dollars) in an amount to be determined at trial, punitive damages in an amount to be determined at trial, an order directing DeepAI to turn over all work, inventions and other property to which P42 is entitled on the Consulting Agreement; attorneys fees and costs, costs of suit, prejudgment interest, and for such other and further relief as the Court may deem just and proper.

**COUNT VI**
**TRESPASS TO CHATTELS**

121.    P42 repeats and realleges each of the allegations above as set forth here.

122.    P42 owns all Company Inventions as that term is defined in the Consulting Agreement.

123.    DeepAI has intentionally interfered with P42's property by preventing P42 from having access to it.

124.    P42 has not consented to DeepAI withholding P42's property and has affirmatively requested that DeepAI deliver P42's property to P42.

125.    DeepAI acted with intent to cause P42 injury. Its conduct was despicable and was done with a willful and knowing disregard of P42's rights based in part on the facts alleged above, including: DeepAI knew that P42's fledgling business was dependent on the product that DeepAI

falsely represented that it would be able to produce, knew that P42 had limited financial means, knew that P42 could not generate revenue without the product DeepAI falsely promised it could produce, knew that returning the property to P42 would help P42 develop the product that DeepAI failed to develop, yet DeepAI still refused to provide the property to P42 and instead represented that it had turned over all property.

126.   DeepAI's conduct also subjected P42 to cruel and unjust hardship in knowing disregard of P42's rights based in part on the facts alleged above, including: DeepAI knew that P42's fledgling business was dependent on the product that DeepAI falsely represented that it would be able to produce, knew that P42 had limited financial means, knew that P42 could not generate revenue without the product DeepAI falsely promised it could produce, knew that returning the property to P42 would help P42 develop the product that DeepAI failed to develop, yet DeepAI still refused to provide the property to P42 and instead represented that it had turned over all property.

127.   As a direct and proximate result of DeepAI converting P42's property, P42 has been harmed.

WHEREFORE, Plaintiff prays for judgment for compensatory damages in excess of $2 million (United States Dollars) in an amount to be determined at trial, punitive damages in an amount to be determined at trial, an order directing DeepAI to turn over all work, inventions and other property to which P42 is entitled on the Consulting Agreement; attorneys fees and costs, costs of suit, prejudgment interest, and for such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Respectfully submitted,

Dated: June 29, 2020                          CALABRO | LAW OFFICE

By: _____

J. Toji Calabro
Attorney for Plaintiff

- 29 -
COMPLAINT

# Exhibit 1

# PATH 42

## CONSULTING AGREEMENT

Consultant Name:  _Deep AI, Inc._  ("Consultant")

Effective Date:  ___March 15th, 2018__

    As a condition of becoming retained (or Consultant's consulting relationship being continued) by Path 42, an Australian corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of Consultant's consulting relationship with the Company and receipt of the compensation now and hereafter paid by the Company, Consultant hereby agrees to the following:[12]

1.    **Consulting Relationship.**  This Consulting Agreement (this "Agreement") will apply to Consultant's consulting relationship with the Company.  If that relationship ends and the Company, within one (1) year thereafter re-engages Consultant as a consultant, this Agreement will also apply to such later consulting relationship, unless the parties hereto otherwise agree in writing.  Any consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."  During the term of this Agreement, Consultant will provide consulting services to the Company as described on Exhibit A hereto (the "Services").  Consultant represents that Consultant is duly licensed (as applicable) and has the qualifications, the experience and the ability to properly perform the Services.  Consultant shall use Consultant's best efforts to perform the Services such that the results are satisfactory to the Company.

2.    **Fees.**  As consideration for the Services provided by Consultant and other obligations, the Company shall pay to Consultant the amounts specified in Exhibit B hereto at the times specified therein.

3.    **Expenses.**  Consultant shall not be authorized to incur on behalf of the Company any expenses and will be responsible for all expenses incurred while performing the Services except as [expressly specified in Exhibit B-1 hereto or]  otherwise agreed to by the Company's President, which consent shall be evidenced in writing for any such expenses in excess of $100.00.  As a condition to receipt of reimbursement, Consultant shall be re-

quired to submit to the Company reasonable evidence that the amount involved was both reasonable and necessary to the Services provided under this Agreement.

4.  **Confidential Information**.[3]

    (a)  **Protection of Information.**  Consultant understands that during the Relationship, the Company intends to provide Consultant with certain information, including Confidential Information (as defined below), without which Consultant would not be able to perform Consultant's duties to the Company.  At all times during the term of the Relationship and thereafter, Consultant shall hold in strictest confidence, and not use, except for the benefit of the Company to the extent necessary to perform the Services, and not disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that Consultant obtains from the Company or otherwise obtains, accesses or creates in connection with, or as a result of, the Services during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of Consultant or of others who were under confidentiality obligations as to the item or items involved.  Consultant shall not make copies of such Confidential Information except as authorized by the Company or in the ordinary course of the provision of Services.  Consultant may disclose Confidential Information only to Consultant's personnel who have a need to know the Confidential Information for Consultant to perform its obligations under the Consulting Agreement and who are bound by a confidentiality agreement at least as restrictive as the terms of this Agreement.

    (b)  **Confidential Information.**  Consultant understands that "Confidential Information" means any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable.  Confidential Information includes, without limitation:  (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom Consultant called or with whom Consultant became acquainted during the

---

[3] The purpose of the provisions in Sections 5 and 6 are to ensure that the Company owns the technology and intellectual property developed by its consultants.  Best practice is that this agreements be signed when consulting begins as some states may question the enforceability of agreements entered into later for lack of contractual consideration.

Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to Consultant by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(c)     **Third Party Information.** Consultant's agreements in this Section 4 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence.  During the term of the Relationship and thereafter, Consultant will not improperly use or disclose to the Company any confidential, proprietary or secret information of Consultant's former clients or any other person, and Consultant will not bring any such information onto the Company's property or place of business.

(d)     **Other Rights.**  This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

(e)     **U.S. Defend Trade Secrets Act.**  Notwithstanding the foregoing, the U.S. Defend Trade Secrets Act of 2016 ("DTSA") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (iii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

5.     **Ownership of Inventions**.

(a)     **Inventions Retained and Licensed.**  Consultant has attached hereto, as Exhibit C, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date:  (i) have been created by or on behalf of Consultant, and/or (ii) are owned exclusively by Consultant or jointly by Consultant with others or in which Consultant has an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder (collectively "Prior Inventions"); or, if no such list is attached, Consultant represents and warrants that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on Exhibit C, Consultant hereby irrevocably and forever waives any and all rights or claims of ownership to such Inventions.  Consultant understands that Consultant's listing of any Inventions on Exhibit C does not constitute an acknowledgement by the Company of the

existence or extent of such Inventions, nor of Consultant's ownership of such Inventions. Consultant further understands that Consultant must receive the formal approval of the Company before commencing Consultant's Relationship with the Company.

(b) **Use or Incorporation of Inventions.** If in the course of the Relationship, Consultant uses or incorporates into any of the Company's products, services, processes or machines any Invention not assigned to the Company pursuant to Section 5(d) of this Agreement in which Consultant has an interest, Consultant will promptly so inform the Company in writing. Whether or not Consultant gives such notice, Consultant hereby irrevocably grants to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c) **Inventions.** Consultant understands that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, modifications, improvements, derivative works, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable. Consultant understands this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon. Consultant understands that "Company Inventions" means any and all Inventions that Consultant or Consultant's personnel may solely or jointly author, discover, develop, conceive, or reduce to practice in connection with, or as a result of, the Services performed for the Company or otherwise in connection with the Relationship, except as otherwise provided in Section 5(g) below.

(d) **Assignment of Company Inventions.** Consultant will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assigns to the Company, or its designee, all of Consultant's right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights and other proprietary rights therein. Consultant hereby waives and irrevocably quitclaims to the Company or its designee any and all claims, of any nature whatsoever, that Consultant now has or may hereafter have for infringement of any and all Company Inventions. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Consultant hereby waives and agrees not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law. If Consultant has any rights to the

-4-

Company Inventions, other than Moral Rights, that cannot be assigned to the Company, Consultant hereby unconditionally and irrevocably grants to the Company during the term of such rights, an exclusive, irrevocable, perpetual, worldwide, fully paid and royalty-free license, with rights to sublicense through multiple levels of sublicensees, to reproduce, distribute, display, perform, prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import, practice methods, processes and procedures and otherwise use and exploit, such Company Inventions.

(e)    **Maintenance of Records.**  Consultant shall keep and maintain adequate and current written records of all Company Inventions made or conceived by Consultant or Consultant's personnel (solely or jointly with others) during the term of the Relationship.  The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format.  The records will be available to and remain the sole property of the Company at all times.  Consultant shall not remove such records from the Company's place of business or systems except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business.  Consultant shall deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Section 6.

(f)    **Intellectual Property Rights.**  Consultant shall assist the Company, or its designee, at its expense, in every proper way in securing the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and shall never assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  Consultant's obligation to execute or cause to be executed, when it is in Consultant's power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world.  Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and in Consultant's behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions.  This power of attorney is coupled with an interest and shall not be affected by Consultant's subsequent incapacity.

(g)   **Exception to Assignments**.  Subject to the requirements of applicable state law, if any, Consultant understands that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any.  In order to assist in the determination of which inventions qualify for such exclusion, Consultant will advise the Company promptly in writing, during and for a period of twelve (12) months immediately following the termination of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by Consultant or Consultant's personnel in connection with, or as a result of, the Services performed for the Company during the period of the Relationship.

(h) **All Company inventions created by the Consultant for or on behalf of the Company** that are used in, related to or necessary for the subject matter of this agreement including any associated trademarks, trade names, algorithms, systems, methodologies, data, goodwill, visualizations and any other intellectual property rights and arrangements vest in the Company immediately upon creation. Excluded from this statement are any of Deep AI's underlying technology, AI, computer vision algorithms, machine learning algorithms, systems, or models enhanced or developed on behalf of Company or Version 1. The aforementioned assets shall remain the the property and inventions of Consultant in perpetuity.

6.   **Company Property; Returning Company Documents**.  Consultant acknowledges that Consultant has no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that Consultant's activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice.  Consultant further acknowledges that any property situated on the Company's premises or systems and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice.  At the time of termination of the Relationship, Consultant will deliver to the Company (and will not keep in Consultant's possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by Consultant or Consultant's personnel pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

7.   **Notice to Third Parties**.  During the periods of time during which Consultant is restricted in taking certain actions by the terms of Section 8 of this Agreement (the "Restriction Period"), Consultant shall inform any entity or person with whom Consultant may seek to enter into a business relationship (whether as an owner, client or otherwise) of Consultant's contractual obligations under this Agreement.  Consultant acknowledges

-6-

that the Company may, with or without prior notice to Consultant and whether during or after the term of the Relationship, notify third parties of Consultant's agreements and obligations under this Agreement. Upon written request by the Company, Consultant will respond to the Company in writing regarding the status of Consultant's engagement or proposed engagement with any party during the Restriction Period.

8.     **Solicitation of Employees, Consultants and Other Parties.** As described above, Consultant acknowledges that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others, and Consultant will not use or disclose such Confidential Information except as authorized by the Company in advance in writing. Consultant further agrees as follows:

        (a)     **Employees, Consultants.** During the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, Consultant shall not, directly or indirectly, solicit any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit employees or consultants of the Company, either for Consultant or for any other person or entity.

        (b)     **Other Parties.** During the term of the Relationship, Consultant will not influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

9.     **Indemnification.** Consultant shall indemnify and hold harmless the Company and its affiliates and their directors, officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) any negligent, reckless or intentionally wrongful act of Consultant or Consultant's Assistants (as defined below), employees, contractors or agents, (ii) any breach by the Consultant or Consultant's Assistants, employees, contractors or agents of any of the covenants contained in this Agreement, (iii) any failure of Consultant to perform the Services in accordance with all applicable laws, rules and regulations, or (iv) any violation or claimed violation of a third party's rights resulting in whole or in part from the Company's use of the Inventions or other deliverables of Consultant under this Agreement.

10.     **Limitation of Liability.** IN NO EVENT SHALL COMPANY BE LIABLE TO CONSULTANT OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER

COMPANY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMIT-ED REMEDY.  IN NO EVENT SHALL COMPANY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY COMPANY TO CONSULTANT UNDER THIS AGREEMENT FOR THE SER-VICES, DELIVERABLES OR INVENTIONS GIVING RISE TO SUCH LIABILITY.

11.    **Term and Termination.**

(a)    **Term.**  Consultant shall serve as a consultant to the Company for a period commencing on 03/03/2018 and terminating on the earlier of (a) the date Consultant completes the provision of the Services to the Company under this Agreement, or (b) the date Consultant shall have been paid the maximum amount of consulting fees as provided in Exhibit B hereto.

(b)    **Termination for Convenience.**  Notwithstanding the above, either party may terminate this Agreement at any time upon 0 business days' written notice.  In the event of such termination, Consultant shall be paid for any portion of the Services that have been performed prior to the termination.

(c)    **Termination for Cause.**  Should either party default in the performance of this Agreement or materially breach any of its obligations under this Agreement, the non-breaching party may terminate this Agreement immediately if the breaching party fails to cure the breach within 30 business days after having received written notice by the non-breaching party of the breach or default.

(d)    **Survival.**  Sections 4-10, 11(d), 14 and 16 shall survive termination or ex-piration of this Agreement in accordance with their terms.

12.    **Independent Contractor.**  Consultant's relationship with the Company will be that of an independent contractor and not that of an employee.

(a)    **Method of Provision of Services.**  Consultant shall be solely responsible for determining the method, details and means of performing the Services.  Consultant may, at Consultant's own expense, employ or engage the services of such employees, subcontractors, partners or agents, as Consultant deems necessary to perform the Services (collectively, the "Assistants").  The Assistants are not and shall not be employees of the Company, and Consultant shall be wholly responsible for the proper performance of the Services by the Assistants such that the results are satisfactory to the Company.  Consul-tant shall expressly advise the Assistants of the terms of this Agreement, and shall require each Assistant to execute and deliver to the Company a Confidential Information and In-vention Assignment Agreement substantially in the form attached to this Agreement as Exhibit D hereto (the "Confidentiality Agreement").  In no event shall any of the Services

-8-

be performed for the Company at the facilities of a third party or using the resources of a third party.

(b) **No Authority to Bind Company.** Consultant acknowledges and agrees that Consultant and its Assistants have no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company.

(c) **No Benefits.** Consultant acknowledges that Consultant and its Assistants shall not be eligible for any Company employee benefits and, to the extent Consultant otherwise would be eligible for any Company employee benefits but for the express terms of this Agreement, Consultant (on behalf of itself and its employees) hereby expressly declines to participate in such Company employee benefits.

(d) **Taxes; Indemnification.** Consultant shall have full responsibility for all applicable taxes for all compensation paid to Consultant or its Assistants under this Agreement, including any withholding requirements that apply to any such taxes, and for compliance with all applicable labor and employment requirements with respect to Consultant's self-employment, sole proprietorship or other form of business organization, and with respect to the Assistants, including state worker's compensation insurance coverage requirements and any U.S. immigration visa requirements. Consultant agrees to indemnify, defend and hold the Company harmless from any liability for, or assessment of, any claims or penalties or interest with respect to such taxes, labor or employment requirements, including any liability for, or assessment of, taxes imposed on the Company by the relevant taxing authorities with respect to any compensation paid to Consultant or its Assistants or any liability related to the withholding of such taxes.

13. **Supervision of Consultant's Services.** All of the services to be performed by Consultant, including but not limited to the Services, will be as agreed between Consultant and the Company's [Supervisor's Title]. Consultant will be required to report to the [Supervisor's Title] concerning the Services performed under this Agreement. The nature and frequency of these reports will be left to the discretion of the [Supervisor's Title].

14. **Consulting or Other Services for Competitors.** Consultant represents and warrants that Consultant does not presently perform or intend to perform, during the term of the Relationship, consulting or other services for, or engage in or intend to engage in an relationship with, companies whose businesses or proposed businesses in any way involve products or services which would be competitive with the Company's products or services, or those products or services proposed or in development by the Company during the term of the Relationship (except for those companies, if any, listed on Exhibit E). If, however, Consultant decides to do so, in advance of accepting such work, Consultant will promptly notify the Company in writing, specifying the organization with which Consultant proposes to consult, or to provide services to and to provide information sufficient to allow the Company to determine if such work would conflict with the terms of

-9-

this Agreement, the interests of the Company or further services which the Company might request of Consultant.  If the Company determines that such work conflicts with the terms of this Agreement, the Company reserves the right to terminate this Agreement immediately.

15.  **Conflicts with this Agreement.**  Consultant represents and warrants that neither Consultant nor any of the Assistants is under any pre-existing obligation in conflict or in any way inconsistent with the provisions of this Agreement.  Consultant represents and warrants that Consultant's performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Consultant in confidence or in trust prior to commencement of this Agreement.  Consultant represents and warrants that Consultant has the right to disclose and/or or use all ideas, processes, techniques and other information, if any, which Consultant has gained from third parties or in the performance of services for third parties, and which Consultant discloses to the Company or uses in the course of performance of this Agreement, without liability to such third parties.  Notwithstanding the foregoing, Consultant shall not bundle with or incorporate into any deliverables provided to the Company hereunder any third party products, ideas, processes, or other techniques, without the express, written prior approval of the Company.  Consultant represents and warrants that Consultant has not granted and will not grant any rights or licenses to any intellectual property or technology that would conflict with Consultant's obligations under this Agreement.  Consultant will not infringe upon any copyright, patent, trade secret or other property right of any former client or third party in the performance of the Services.  Consultant acknowledges and agrees that Consultant has listed on Exhibit F all agreements (e.g., non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client or any other person or entity, that may restrict Consultant's ability to perform services for the Company or Consultant's ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict Consultant's ability to perform Consultant's duties for the Company or any obligation Consultant may have to the Company.  Consultant shall not enter into any written or oral agreement that conflicts with the provisions of this Agreement.

16.  **Miscellaneous.**

(a)  **Governing Law.**  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of California, without giving effect to principles of conflicts of law.

(b)  **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior

-10-

or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

      (c)    **Amendments and Waivers.**  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.  No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

      (d)    **Successors and Assigns.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.  The Company may assign any of its rights and obligations under this Agreement.  No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

      (e)    **Notices.**  Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

      (f)    **Severability.**  If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected.  The Company and Consultant have attempted to limit Consultant's right to use, maintain and disclose the Company's Confidential Information, and to limit Consultant's right to solicit employees and customers only to the extent necessary to protect the Company from unfair competition.  Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 8 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.  In the event that any court or government agency of competent jurisdiction determines that, notwithstanding the terms of this Agreement specifying Consultant's Relationship with the Company as that of an independent contractor, Consultant's provision of Services to the Company is not as an independent contractor but instead as an employee under the applicable laws, then solely to the extent that such determination is applicable, references in this Agreement to the Relationship between Consultant and the Company shall be interpreted to include an employment relationship, and this Agreement shall not be invalid and unenforceable but

-11-

shall be read to the fullest extent as may be valid and enforceable under the applicable laws to carry out the intent and purpose of this Agreement.

(g)     **Remedies.**  Consultant acknowledges that violation of this Agreement by Consultant may cause the Company irreparable harm, and therefore that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

(h)     **Facilitation of Agreement.**  Consultant agrees to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

(i)     **Construction.**  This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(j)     **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.  Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

(k)     **Electronic Delivery.**  The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means.  Consultant hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

*[Signature Page Follows]*

The parties have executed this Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**THE COMPANY:**

~~DEEP AI, INC.~~ Path 42 PTY Ltd

By: _____
(Signature)

Name: _Lancine Traore_

Title: _CEO_

Address: 2/55 Ocean Av
Double Bay NSW 2028 Australia

Date: _15 March 2018_

**CONSULTANT:**

_____DEEP AI, INC._____
(PRINT NAME)

By: _____
(Signature)

Name: _____Peter Griggs_____

Title: _____Officer_____

5532 San Patricio Drive

Santa Barbara, CA.  93111.

United States
Email: peter@deepai.org

Date:_____ March, 15th, 2018 _____

-13-

<u>**EXHIBIT A**</u>

**DESCRIPTION OF CONSULTING SERVICES**

**Path 42 - v1.0**

**Data Inputs**

**Provided by Path 42**

**100 AU videos** – 500 nat. rep. respondents each, enabling data to be split by key demographic group

Survey responses for each video

Second by second facial coding data including micro expressions

Second by second soundtrack mood analysis

Automated eye-tracking heat maps

**Up to 3,000 campaign videos** - campaign metrics by distribution format (FB video, YT skippable, YT non-skippable, Instagram video, VOD)

**Data Inputs Provided by DeepAI**

Second by second computer vision assessment of what's happening on screen in test videos

NLP/sentiment analysis

FB API used to access text written by respondents

Send FB text to Watson for personality profiling and store for later aggregation

**System Requirements**

Build algorithmic models to determine key correlations among test batch data

Test Batch One

**Build algorithmic models to determine correlations** between video attributes and video outcomes, split by respondent information:

IWOVFOOTER1

Video Attributes

Video Outcomes

Respondent Information

Facial Coding

DeepAI Computer Vision

NLP dialogue/sentiment analysis

Moodagent Soundtrack Analysis

Dragonfly Eyetracking Analysis

Facial coding emotional response

Reported emotional response

Brand metrics

Social media metrics

Age/gender/socio-economics

Personality type

**Test Batch Two**

Build algorithmic models to determine correlations between video attributes and video outcomes, split by platform, format and device:

Video Attributes

Video Outcomes

Platform, Format and Device

DeepAI Computer Vision

NLP dialogue/sentiment analysis

Moodagent Soundtrack Analysis

Dragonfly Eyetracking Analysis

Campaign metrics

Social media metrics

Long form

FB

YT skippable

YT forced

Insta

Snap

Mobile

Desktop

**Visualize correlations found in test batch data in a dashboard**

Create dashboards for the visualization of correlations to power 3 core Path 42 products: Ideate, Evaluate, Execute:

**Ideate**

Dashboard showing correlations between video attributes and emotions and brand metrics, split by demographic

**Evaluate**

Video performance summary dashboard

**Execute**

Audience to target to drive performance of video versus chosen KPI

**Investigative work to prepare for Version 2**

Investigate the need for an app to collect videos and photos posted by survey respondents, answering the following questions:

Is a FB app required to have access to photos and videos?

How can we keep FB videos and photos for future use?

How can we pull engagement data for videos and photos

If a respondent has our app downloaded can we continue to access their posts?


Investigate and provide quote for the ability to ingest client data (e.g. CRM, campaign performance, social metrics etc.) to create a bespoke system for key clients.

Investigate and provide quote for the creation of a system which automates video analysis based on correlations found in test batch data

## EXHIBIT B

## COMPENSATION & CONSIDERATIONS

**For Services rendered by Consultant under this Agreement**, the Company shall pay Consultant at a project rate of $70,000 USD during the development of v1.0 as outlined herein, payable via wire transfer at the start of each 4 week period during the 16 weeks of v1.0 development. Company agrees to pay any sending fees or currency conversion costs they incur during payment.

**v1.0 Payment/Development Schedule:**

> **03/16/2018** - Start of v1.0 development, Payment 1: $17,500USD
>
> **04/16/2018** - Start of month 2, v1.0 development, Payment 2: $17,500USD
>
> **05/16/2018** - Start of month 3, v1.0 development, Payment 3: $17,500USD
>
> **06/16/2018** - Start of month 4, v1.0 development, Payment 4: $17,500USD
>
> **07/16/2018 - End of month 4, v1.0 development complete**

**For product development and engineering Services rendered by Consultant beyond the work specified under this agreement**, Company shall pay Consultant a rate of $180.00USD per hour of billable work or an equivalent project rate negotiated in the future.

**For the first 24 months after v1.0 completion,** Company agrees to use Deep AI, Inc's core computer vision APIs within their platform for all visual recognition data needed for all customer's of Company, so long as the data is available through Deep AI, Inc's api service.

## EXHIBIT C

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP
### EXCLUDED UNDER SECTION 5(a)

The following is a list of all Inventions that, as of the Effective Date: (A) have been created by or on behalf of Consultant, and/or (B) are owned exclusively by Consultant or jointly by Consultant with others or in which Consultant has an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder:

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
| All computer vision models, underlying algorithms, and neural network training infrastructure. | | |

Except as indicated above on this Exhibit, Consultant has no inventions, improvements or original works to disclose pursuant to Section 5(a) of this Agreement.

\_\_\_ Additional sheets attached

Print Name of Consultant: _____Deep AI, Inc._____

By: _____

(Signature)

Name: \_\_\_\_\_Peter Griggs_____

Title: \_\_\_\_\_Officer_____

Date: _____

## EXHIBIT F

## RESTRICTIVE AGREEMENTS UNDER SECTION 15

**Deep AI, Inc, while in a contract relationship with the Company and for a period of 12 months after they cease to be in a contract relationship with the Company shall not:**

carry on any business which directly or indirectly competes with the business of the Company in relation to the advertising industry (with the exception that any such party is permitted to use Deep's SaaS products or API services);

solicit any customer or client of the Company;

accept a customer or client of the Company;

use or disclose any trade secrets, product information or confidential information of the Company which is not generally known or available in the marketplace; or

induce any person to terminate his or her employment or contract with the Company.

**Deep AI, Inc. warrants that at any time, each of Peter Griggs, Matthew Reed and Kevin Baragona will not directly or indirectly:**

solicit, initiate or encourage any inquiries, discussions or proposals from any other person or entity regarding Version 1 or the business of the Company;

continue, solicit, encourage or enter into negotiations or discussions relating to any part of the business of the Company except with the written consent of the Company; or

furnish to any other person or entity any information (not already in the public domain) relating to any of the Business of the Company except with the written consent of the Company.

**For the avoidance of doubt, Deep AI, Inc. warrants that** each of Peter Griggs, Matthew Reed, and Kevin Baragona will not carry on any business which directly or indirectly competes with the business of the Company in relation to the advertising industry. One exception to the statements in this Non-Competition section is the occurrence of advertising or related companies using any of Deep AI, Inc.'s SaaS products or API services, and the encouragement of such behavior by the Deep AI, Inc. or any of it's members. Other exceptions include an investment round or merger/acquisition involving Deep AI, Inc. and any business which directly or indirectly competes with the business of the Company in relation to the advertising industry.

**Consultant is prohibited from using any part of Version 1 (or subsequent versions) that is property of Company** for any other commercial enterprise in relation to the advertising industry.

Print Name of Consultant: _____Deep AI, Inc._____

By: _____

(Signature)

Name: _____Peter Griggs_____

Title: _____Officer_____

Date: _____March 15th, 2018_____